# In the United States Court of Federal Claims

No. 19-047L
(Filed: April 3, 2020)

| | |
|---|---|
| **JOHN CARPENTER et al.,** | **Keywords:** rails-to-trails, easements, Fifth Amendment, Vermont, takings, railroad, right-of-way, merger doctrine, partial summary judgment, railbanking, RCFC 56(a) |
| *Plaintiffs,* | |
| **v.** | |
| **UNITED STATES,** | |
| *Defendant.* | |

*Adam Riley*, and *Ethan Flint*, Flint Law Firm, LLC, Edwardsville, IL, for Plaintiffs.

*Christopher Chellis*, United States Department of Justice, Environment & Natural Resources Division, Natural Resources Section, with whom were *Jean Williams*, United States Department of Justice, Environment & Natural Resources Division, Deputy Assistant Attorney General, Washington, D.C., for Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

This case arises under the National Trails System Act of 1968 (Trails Act) and concerns several parcels of land along a railway line in Bennington, Vermont. Before the Court are the parties' cross-motions for partial summary judgment. On November 9, 2019, Plaintiffs moved for partial summary judgment on one claim by Amory Pacific, LLC,[1] alleging that the United States Surface Transportation Board's ("STB" or the "Board") conversion of the railway corridor into recreational trail, by operation of the Trails Act, effected a taking of Plaintiffs' property. (Pls. Mot., ECF No. 21). On December 6, 2019, the United States responded and filed a cross-motion seeking partial summary judgment on five parcels, including the Amory Pacific claim that is the subject of Plaintiffs' motion, arguing that Amory Pacific has no ownership interest on which to base its takings claim. (Def. Mot. at 1, ECF No. 24). On December 27, 2019, and January 10, 2020, the parties filed their respective replies. (Pls. Reply, ECF No. 26; Def. Reply, ECF No. 27). This matter is now fully briefed and ripe for decision.

For the reasons set forth below, the Court **GRANTS** Plaintiffs' Motion for Partial Summary Judgment with respect to the claim brought by Amory Pacific, LLC; **DENIES-IN-PART** the United States' Cross-Motion for Partial Summary Judgment as it relates to the Amory Pacific claim; and **GRANTS-IN-PART** the United States' Cross-Motion for Summary

---

[1] Parcel No. 051-015-66122.

Judgment as it relates to the claims brought by John and Sylvia Carpenter,[2] Dwayne Scott Dupee,[3] and SEALL, INC.[4] Finally, Plaintiffs' motion requesting oral argument (ECF No. 28) is **DENIED AS MOOT**.

## I.    Background

The property at issue is a 1.57-mile segment of a railroad right-of-way corridor running through the Town of Bennington, Vermont. (Def. Mot. at 5). This segment is part of a 131-mile rail line owned by the State of Vermont and currently operated by Vermont Railway, Inc. ("VTR"), but has been owned or used by several railroad companies over the years.[5] (*See* Def. Mot, Ex. 1). Vermont's acquisition and VTR's operation of this line was authorized by the Interstate Commerce Commission ("ICC")—a predecessor agency to the STB— in 1964. (*Id.*, Ex. 2). In 2004, the STB authorized VTR to operate the line under a modified certificate, which exempted VTR from the requirements of 49 U.S.C. § 10903 regarding termination of operations. (*Id.*).

On July 5, 2018, VTR filed a 49 C.F.R. § 1152.50 Notice of Exemption to abandon rail service over the 1.57-mile segment of rail line and pursue a public use and interim trail use agreement with the Town of Bennington. (*Id.*, Ex. 1). On September 14, 2018, pursuant to VTR's Notice and the Town of Bennington's request, the STB issued a Notice of Interim Trail Use ("NITU"). (*Id.*, Ex. 2). On October 16, 2018, the Town of Bennington, State of Vermont, and VTR filed their interim trail use agreement with the STB. (*Id.*, Ex. 4). Under the terms of the agreement, the Town of Bennington assumed responsibility for the management of the right-of-way corridor, as well as the associated legal and tax liabilities. (*Id.*).

On November 9, 2019, Plaintiffs moved for Partial Summary Judgment on a single parcel belonging to Amory Pacific, LLC. (Pls. Mot. at 2). On December 6, 2019, the United States filed its Response and Cross-Motion for Partial Summary Judgment on five parcels: John Carpenter and Sylvia Carpenter; Dwayne Scott Dupee; Amory Pacific, LLC; and SEALL, INC. (Def. Mot. at 10, 12, 14; *see also* Stipulations, ECF No. 18). In their response and reply, Plaintiffs conceded the Carpenter, Dupee, and one of the SEALL claims should be dismissed.[6] (Pls. Reply at 3).

---

[2] Parcel Nos. 051-015-66938 and 051-015-66925.

[3] Parcel No. 051-015-66944.

[4] Parcel No. 051-015-66933.

[5] Successive ownership of the right-of-way is not at issue in this case. For the sake of brevity, this Opinion occasionally refers to the owner of the rail line as simply "the railroad" without denoting which company owned and operated the line in the relevant time period.

[6] The United States has agreed to proceed to valuation on two other parcels owned by SEALL, INC. (Pls. Mot. at 26 n. 2). Plaintiffs maintain that a small portion of Parcel No. 051-015-66933 relates to the same source deed (44/151) and should therefore proceed to valuation with the remainder of SEALL's claims. (*Id.*). Plaintiffs have not expounded on the meaning of this footnote after conceding dismissal in the body of their Reply. As the United States has supported its motion, the Court finds this claim appropriate for dismissal.

The subject of the parties' remaining dispute is whether the railroad source deed ("Patchin deed") recorded at Book 31, Page 489 (the "31/489 deed") in Bennington County, Vermont, conveys property in fee simple or merely an easement.

## II.   Summary Judgment Standard

The jurisdiction of the Court of Federal Claims is primarily found in the Tucker Act, which allows the Court "to render any judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express of implied contract with the United States . . . in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Under the Tucker Act, the United States waives its sovereign immunity for certain claims founded on another source of substantive law. *United States v. Testan*, 424 U.S. 391, 298 (1976); *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005). "Rails-to-rails" claims based on the Fifth Amendment's takings clause fall squarely within this Court's jurisdiction. *See Preseault v. I.C.C.*, 494 U.S. 1 (1990).

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A "genuine dispute" exists where a reasonable factfinder "could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those which might significantly alter the outcome of the case; factual disputes which are not outcome-determinative will not preclude summary judgment. *Id*. In determining whether summary judgment is appropriate, the court should not weigh the credibility of the evidence, but simply "determine whether there is a genuine issue for trial." *Id*. at 249. In so deciding, the Court must draw all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 578–88 (1986).

## III.   Discussion

The parties agree that, in 1852, the Western Vermont Railroad ("WVR") acquired a parcel from Lyman Patchin by quitclaim deed for use in railroad operation. (*See* Stipulations at 2; Pls. Mot., Ex. F). The parties further agree that Amory Pacific is the current owner of the parcel conveyed in this transaction. (*See* Stipulations at 2). The parties disagree whether this deed conveyed an easement or conveyed the corridor in fee simple. (*See* Pls. Mot. at 10; Def. Mot. at 12–13).

Plaintiffs argue the Western Vermont Railroad company obtained only an easement in the Patchin transaction and that easement expired once rail operations ceased. (Pls. Mot. at 1). If the transaction conveyed only an easement, Plaintiffs argue, Amory Pacific assumed full ownership in the land once railroad operations ceased and the parcel was converted to recreational trail use. (*Id*.). Consequently, Plaintiffs argue Amory Pacific is entitled to compensation under the Fifth Amendment takings clause. (*Id*. at 2). The United States argues the railroad acquired the parcel from Amory Pacific's predecessors-in-interest in fee simple, thus Amory Pacific has no standing to pursue a takings claim. (Def. Mot. at 1–2). Resolution of these arguments requires an analysis of several different bodies of law, as explained below.

### a.  The Trails Act

The Interstate Commerce Act of 1887 vested the ICC with excusive authority over the construction, operation, and abandonment of most railroad lines in the United States. *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311 (1981); *Caldwell v. United States*, 391 F.3d 1226, 1228 (Fed. Cir. 2004). The STB, as a successor agency to the ICC, was vested with this exclusive and plenary authority in 1996. 49 U.S.C. § 1302.

A railroad under the jurisdiction of the STB cannot discontinue service without the consent of the Board. *Caldwell*, 391 F.3d at 1228. To terminate service along a rail line, the railroad "must either (1) file a standard abandonment application that meets the requirements of 49 U.S.C. § 10903; or (2) seek an exemption, under 49 U.S.C. § 10502." *Id.* The Trails Act provides a third option, colloquially known as "railbanking," whereby the railroad negotiates with a "trail operator" (usually a state or local municipality) to "assume financial and managerial responsibility for operating the railroad right-of-way as a recreational trail." *Id.* at 1229; 16 U.S.C. § 1247. When a right-of-way is "railbanked," the abandonment proceedings are stayed, and the STB retains jurisdiction over the corridor with the option to restart rail service at later date. *Caldwell*, 391 F.3d at 1229; 49 C.F.R. § 1121.4. Because the abandonment proceedings are stayed, so too is the operation of state property law which might "result in extinguishment of easements for railroad purposed and reversion of rights of way to abutting landowners." *Id.* (quoting 2 I.C.C.2d 591, 1986 WL 68617 (1986)). Therefore, a Fifth Amendment "taking" occurs "if the original easement granted to the railroad under state property law is not broad enough to encompass a recreational trail." *Id.* (citing *Preseault v. United States*, 100 F.3d 1525, 1552 (Fed. Cir. 1996) ("*Preseault II*")).

The railbanking process begins when the railroad either files an abandonment application under 49 U.S.C. § 10903 or a notice of exemption under 49 U.S.C. § 10502. *Id.* at 1229–30. A potential trail operator then files a railbanking petition which must include: (1) a map and description of the right-of-way; (2) a statement assuming managerial, financial, and legal responsibility for the right-of-way; and (3) an acknowledgment the right-of-way could be reactivated for rail service. 49 C.F.R. § 1152.29. A successful petitioner who shows reciprocal interest from the railroad will then receive a Notice of Interim Trail Use ("NITU") from the STB. 49 C.F.R. §§ 1152.29(b)(2) and (d). The NITU "permits the railroad to discontinue service, cancel tariffs, and salvage track and other equipment, 'consistent with interim trail use and rail banking' without consummating an abandonment and the NITU extends indefinitely to permit interim trail use once an 'agreement' is reached between the railroad and the trail operator." *Caldwell*, 391 F.3d at 1230 (quoting 49 C.F.R. § 1152.29(d)(1)). If the railroad and trail operator reach a railbanking and interim trail use agreement, the STB's jurisdiction over the rail line is preserved. *Caldwell*, 391 F.3d at 1229; 49 C.F.R. § 1121.4. When the trail agreement is reached, a permanent Fifth Amendment taking occurs since the abandonment procedures are effectively blocked. *Caldwell*, 391 at 1235 (citing *Preseault II*, 100 F.3d at 1552).

### b.  Vermont Law

The threshold issue in a takings analysis is whether the plaintiff "has a compensable property interest in the land allegedly taken[.]" *Chicago Coating Co. v. United States*, 892 F.3d 1164, 1167 (Fed. Cir. 2018) (internal citations omitted). In making this determination, courts

"look to the law of the state in which the property is located." *Barlow v. United States*, 123 Fed. Cl. 186, 194 (2015) (citing *Preseault II*, 100 F.3d at 1540). Here, because the parcels in question are located in Vermont, the Court will follow Vermont law.

Under Vermont law, if the railroad acquired title to the land in fee simple, then the successors-in-interest "have no right or interest in those parcels" and thus do not have standing to maintain a takings action. *Preseault II*, 100 F.3d at 1533. However, a plaintiff does have standing to bring a takings claim if (1) the Railroad acquired only an easement; (2) the easement "imposed on the property owners' underlying fee simple estates"; and (3) the easement was "limited to uses that did not include public recreational hiking and biking trails[.]" *Id*. Under Vermont law, when a railroad acquires property through formal eminent domain procedures, the railroad acquires only an easement that reverts to the grantor. *Old Railroad Bed, LLC v. Marcus*, 196 Vt. 74, 78 (2014) (citing *Dessureau v. Maurice Mem'ls, Inc.*, 132 Vt. 350, 351 (1974)).

The nature of the property interest can often be resolved "by analyzing the original deeds that conveyed the property to the railroad[.]" *Chicago Coating*, 892 F.3d at 1167. However, the deed is not always determinative of the scope of the property interest the railroad acquired. *Troy & Boston R.R. v. Potter*, 42 Vt. 265 (1869); *see also Old Railroad Bed*, 196 Vt. at 81 (citing *Barre R.R. v. Montpelier & Wells River R.R.*, 61 Vt. 1 (1889)).

If an eminent domain proceeding occurred before the deed was recorded, the language of the deed deserves more scrutiny to determine whether the railroad obtained merely an easement or acquired the parcel in fee simple. *See Old Railroad Bed*, 196 Vt. at 79. In addition to the deed, courts may rely "on the location survey, together with all of the other surrounding circumstances" to determine whether a parcel has been taken by eminent domain or acquired in a fee simple transaction. *See id*.

According to the Vermont Supreme Court, an eminent domain taking occurs "when the initial steps, pointed out by the [Vermont eminent domain statute], were taken, [and] there only remained for the company to acquire [the parcel] through purchase or through proceedings *in invitum*."[7] *Barre R.R.*, 61 Vt. at 6. For example, in *Troy & Boston R.R. v. Potter*, the Vermont Supreme Court held that a survey and location selection for the railroad's right-of-way were sufficient "initial steps" to effectuate the taking, despite the absence of a recorded deed memorializing the right-of-way rights. 42 Vt. at 272. In *Old Railroad Bed*, however, the Vermont Supreme Court made clear that a location survey does not transform a fee-simple conveyance into an easement. 196 Vt. at 79, 82 ("[M]erely by virtue of the location survey referenced in the original deeds, the properties here were [not] necessarily acquired by eminent domain."). These cases, when read together, highlight that the nature of the estate described in the deed does not always control.

---

[7] "*In invitum*" means "against an unwilling person." Black's Law Dictionary 903 (10th ed. 2014). The phrase is often invoked in connection with eminent domain condemnation proceedings. *See, e.g.*, *City of Winooski v. State Hwy. Bd.*, 124 Vt. 496, 500 (1965).

When there is no clear indication of the scope of the interest acquired by the railroad, Vermont courts have looked to the eminent domain authority granted to the railroad as encapsulated in its corporate charter. For a railroad to acquire a parcel in fee simple through eminent domain, it must explicitly possess such authority in its corporate charter. *Preseault v. United States*, 24 Cl. Ct. 818, 829 (1992) ("*Preseault I*") (citing *Hill v. Western Vermont Railroad Co.*, 32 Vt. 68 (1859) and *Page v. Heineberg*, 40 Vt. 81 (1868)). In either a sale or condemnation proceeding where the railroad has the power to acquire a parcel compulsorily, "there is this implied limitation upon the power, that the company will take only so much land or estate therein as is necessary for their public purposes." *Hill*, 32 Vt. at 76. "Where no articulation of such power exists, more than 100 years of well-settled Vermont law supports the presumption that a railroad may only take what is 'necessary' to its purpose, namely, an easement." *Preseault I*, 24 Cl. Ct. at 829.

The Court recognizes that questions of the interpretation of Vermont law may be best addressed by the state courts of Vermont. However, Vermont courts have declared themselves without subject matter jurisdiction to involve themselves in railroad abandonment disputes. *See Trustees of the Diocese of Vermont v. Vermont*, 145 Vt. 510 (1985). Further, Vermont has previously advised that it lacks any mechanism to resolve such questions on referral from federal courts. *Preseault II*, 100 F.3d at 1534. Like the Federal Circuit in *Preseault II*, "[w]e have no choice, then, but to determine this question of state law ourselves." *Id.*; *see Meredith v. City of Winter Haven*, 320 U.S. 228, 234 (1943) ("[I]t has from the first been deemed to be the duty of the federal courts, if their jurisdiction is properly invoked, to decide questions of state law whenever necessary to the rendition of a judgment.").

### c.  The Nature of Amory Pacific's Property Interest

Plaintiffs contend Amory Pacific is a successor-in-interest to land acquired by the Western Vermont Railroad Company in a quitclaim deed (the Patchin deed), and that the survey and location selection recorded prior to the Patchin deed constituted a taking by eminent domain. (Pls. Mot. at 10–16). Thus, Plaintiffs argue, the railroad acquired only an easement. (Pls. Mot. at 15). The United States argues the Patchin deed conveyed property in fee simple, precluding Amory Pacific from asserting the property interest necessary to maintain its takings claim. (Def. Mot. at 12). As explained below, the Court agrees with the Plaintiffs.

### d.  The Patchin Deed

The railroad formally acquired its interest in the parcel at issue through a purchase transaction, encapsulated in the Patchin deed. (Pls. Mot., Ex. F). The deed provides:

> Know all men by these presents [sic], that we, Syman [sic] Patchin, Samuel H. Blackman, Sylvia Black-man his wife, D[illegible] Squires and Newell Squires, all of Bennington in the County of Bennington and State of Vermont, for the consideration of one hundred and sixty two dollars [$162.00] received to our full satisfaction of the Western Vermont Railroad Company of in the County of and State of Vermont, have remised and released and by these

6

> presents do remise and quit claim to the said Western Vermont Rail-road
> Company, their heirs and assigns forever, **all our right, title, interest or
> demand in** or unto a piece or parcel of land lying and being in Bennington. .
> . . being the same piece of land **surveyed and taken** by said Western
> Vermont Railroad Company to build their Railroad upon
>
> . . .
>
> To have and to hold the above remised and quit-claimed premises, with the
> appurtenances thereof unto the said Western Vermont Railroad Company and
> their heirs and assign forever, **to their own proper use, benefit, and behoof**
> . . . .

(*Id*. (emphasis added) (errors in original); *see also* Def. Mot. at 12; Pls. Mot. at 4)). Importantly, as Plaintiffs repeatedly highlight and the United States does not dispute, this deed was recorded following a survey and recording of the location selection. (Pls. Mot. at 13; *see* Def. Mot. at 15).

Two provisions of this deed support Plaintiffs' argument that Amory Pacific retained a reversionary interest in the parcel because the railroad only acquired an easement. First, the deed indicates the parcel it conveys is the "same piece of land surveyed and taken" by the railroad. (Pls. Mot., Ex. F). In other words, the railroad had already exercised its eminent domain power over the parcel prior to execution of the deed, acquiring an easement. Second, the grantors remit the parcel to the railroad for "their own proper use, benefit, and behoof,"[8] which indicates the interest was an easement rather than a fee simple estate. (*Id*.). The deed makes no mention of the estate conveyed, stopping short of granting a fee simple estate. Instead, the deed limits the conveyance to the railroad's "use, benefit, and behoof[.]" (*Id*.). In interpreting whether Amory Pacific's predecessors-in-interest retained a reversionary interest through the recording of the deed, we are guided by the decisions of the Federal Circuit and alternatively, the Vermont Supreme Court.

### e. *Preseault II*

This Court is bound by decisions of its predecessor, the Court of Claims, as well as decisions by the Federal Circuit and the Supreme Court of the United States. *S. Corp. v. United States*, 690 F.2d 1368 (Fed. Cir. 1982) (*en banc*). Because the *Preseault* line of cases contains controlling law that bears on the outcome of the present dispute, the Court addresses those cases before analyzing Vermont law. *See, e.g.*, *Preseault v. I.C.C.*, 494 U.S. 1 (1990); *Preseault II*, 100 F.3d 1525 (Fed. Cir. 1996); *Preseault I*, 24 Cl. Ct. 818 (1992).

At issue in *Preseault II* were three parcels acquired by the railroad—two through commissioner awards and one via warranty deed. 100 F.3d at 1534–35. The Federal Circuit summarized the warranty deed as follows:

---

[8] "Behoof" is an archaic term that means a "use, profit, or advantage that is part of a conveyance." Black's Law Dictionary (10th ed. 2014).

> The operative instrument is a warranty deed, dated August 2, 1899, from Frederick and Mary Manwell to the Railroad. The deed contains the usual habendum clause found in a warranty deed, and purports to convey the described strip of land to the grantee railroad **"[t]o have and to hold the above granted and bargained premises ... unto it the said grantee, its successors and assigns forever, to its and their own proper use, benefit and behoof forever."** The deed further warrants that the grantors have "a good, indefeasible estate, in fee simple, and have good right to bargain and sell the same in manner and form as above written. . . .

*Id.* at 1535 (emphasis added). The Federal Circuit held that despite the language purporting to create a fee simple interest, "[u]nder well-settled Vermont law, the property interests in the parcel . . . conveyed following survey and location by warranty deed, amounted to [an] easement[ ]...." *Id.* (citing *Preseault I*, 24 Cl. Ct. at 830). In its decision, the trial court considered a trio of Vermont Supreme Court cases: *Hill v. Western Vermont Railroad Co.*, 32 Vt. 68 (1859), *Page v. Heineberg*, 40 Vt. 81 (1868), and *Troy & Boston Railroad Co. v. Potter*, 42 Vt. 265 (1869). *Preseault I*, 24 Cl. Ct. at 827–30.

In discussing *Hill*, the *Preseault I* court analyzed the corporate charter of the Western Vermont Railroad Company, the same railroad charter relevant to the instant proceedings. *See Preseault I*, 24 Cl. Ct. at 828. The court held that its charter did not grant the Western Vermont Railroad Company power to acquire land in fee simple and therefore, the interest acquired could only have been an easement. *Id.* at 829, *aff'd*, *Preseault II*, 100 F.3d at 1537. In affirming, the Federal Circuit cited profusely to Vermont law holding "the act of survey and location is the operative determinant, and not the particular form of transfer, if any." *Preseault II*, 100 F.3d at 1537. Thus, because the survey and location initiated the exercise of the railroad's eminent domain power, "the proceeding retained its eminent domain flavor, and the railroad acquired only that which it needed, an easement for its roadway." *Id.*

When the Federal Circuit issues a decision, this Court is not free to ignore it absent (1) intervention from the U.S. Supreme Court or (2) abrogation by statute. *See Strickland v. United States*, 423 F.3d 1335, 1338 n. 3 (Fed. Cir. 2005). Neither has occurred here. The facts material to a decision in the instant case are nearly indistinguishable from those examined by the Federal Circuit in *Preseault II*. Both involved the same railroad charter, similar deed language, and the same process of conveyance—survey and recording of location prior to recorded deed.

In *Preseault II*, conveyance of the parcel to the railroad for its "own proper use, benefit and behoof" is language identical to that of the Patchin deed. *See* 100 F.3d at 1535. In fact, the *Preseault II* deed goes further than the Patchin deed to identify the estate it purportedly created: a fee simple interest. *Id.* Nevertheless, the *Preseault II* court held that, under Vermont law, an easement was created. *Id.* at 1537. Like *Preseault II*, the Patchin deed followed the recording of a survey and location selection and contained language that conveyed only what the railroad required for its "own proper use, benefit and behoof[.]" Therefore, through the recording of the Patchin deed, "the proceeding retained its eminent domain flavor, and the railroad acquired only that which it needed, an easement for its roadway" rather than land in fee simple. *Id.*

Consequently, the Court must grant the Plaintiffs' motion for partial summary judgment on the Amory Pacific claim and deny the United States' motion with respect to the same.

### f.   Consistency With Vermont Law

Even if this Court were not bound by the decision in *Preseault II*, the conclusion that the railroad acquired only an easement is supported on alternative grounds by Vermont law. Specifically, the railroad obtained an easement when it surveyed and recorded the location of the right-of-way, an exercise of its eminent domain power. Further, the Patchin deed does not purport to convey the parcel in fee simple, and even if it did, the Western Vermont Railroad would have been prohibited by its corporate charter from exercising its eminent domain power to acquire a fee simple interest. Several cases from the Vermont Supreme Court support this conclusion.

The parties chiefly disagree on what effect, if any, *Old Railroad Bed v. Marcus*, 196 Vt. 74 (2014), has on this case. The United States argues *Old Railroad Bed* holds that a fee simple deed is not converted to an easement simply because the survey and location selection were recorded prior to execution of the deed. (Def. Mot. at 16–17). Plaintiffs, on the other hand, argue that *Old Railroad Bed* does not control Amory Pacific's claim because in *Old Railroad Bed*, the fee simple deed was recorded before the survey or location was recorded. (Pls. Reply at 6). However, *Old Railroad Bed* makes clear that we must examine the location survey "together with all of the other surrounding circumstances" to find evidentiary support that a parcel was taken by eminent domain. *Old Railroad Bed*, 196 Vt. At 79.

*Old Railroad Bed* emphasizes that recording of a location survey does not automatically mean the parcel was acquired by eminent domain. *Id*. at 81. However, *Old Railroad Bed* only resolves whether a recording of a location survey can change the character of the estate described in an already-recorded deed. *Id*. Several other cases inform the Court's analysis of Vermont law.

In *Hill v. Western Vt. R.R.*, the parties failed to record a conveyance instrument for a transaction between the Western Vermont Railroad and a Vermont landowner. 32 Vt. at 69. The Court found the location selection constituted the act of a taking using the eminent domain power. *Id*. at 69–72. The Vermont Supreme Court then reviewed the corporate charter of the Western Vermont Railroad Company to determine the nature of the land estate the railroad acquired, ultimately holding the railroad's eminent domain power was limited to acquisition of easements. *Id*. at 74.

In *Page v. Heineberg*, the Vermont Supreme Court addressed whether the Vermont Central Railroad acquired property in fee simple, or whether the railroad was only permitted to exercise eminent domain to acquire easements. 40 Vt. at 84–85. The court relied on the broad authority in the railroad's charter to find the railroad had the power to acquire the entire estate through an ordinary purchase transaction. *Id*. at 86.

Under Vermont law, the selection of a location constitutes exercise of the eminent domain power to take land for public use. *Hill*, 32 Vt. at 69–72 ("After the [right-of-way] is once

located and finished, the right to acquire land by statute proceedings cannot be exercised further."); *see also Troy & B.R Co. v. Potter*, 42 Vt. at 272. All that is left is to determine whether through that exercise, the railroad acquired an easement or a fee simple. *Hill*, 32 Vt. at 73. Without an instrument—either deed or contract—that specifies the character of the taking (which occurs at the time of the location selection), Vermont law is clear that the estate taken is the maximum property interest allowed under the railroad's eminent domain power. *Id*. at 75 ("[W]here [railroads] have by their charter the power to [take land] compulsorily, there is this implied limitation upon the power, that the [railroad] will take only so much land *or estate therein* as is *necessary* for their public purposes.") (emphasis added).

To find the extent of that power, we look to the railroad's charter. *Id*. ("[W]here the quantity of estate is not defined, that it should be construed . . . according to the object and purport of the grant, and the *necessities* or wants of the corporation thereby created.") (emphasis added). The power to exercise eminent domain to acquire in fee simple must be delineated explicitly in the corporate charter, or else the railroad has only the power to exercise its eminent domain power to acquire an easement. *See Page*, 40 Vt. at 86 (distinguishing *Hill* by holding "in *this* charter we think [Vermont Central R.R.] have this comprehensive signification, and clothe the company with the power or capacity to take the entire estate[.]") (emphasis added); *Troy & B.R Co.*, 42 Vt. at 273. The *Page* court took pains to stress the acquisition power depended "mainly[ ] upon the provisions of the charter of the company[.]" *Page*, 40 Vt. at 86.

As explained above, the corporate charter of the Western Vermont Railroad indicates the railroad was not capable of exercising its eminent domain power to acquire land in fee simple. Here, the survey and location selection took place before the Patchin deed was recorded, and nothing in the Patchin deed purports to evidence a purchase transaction of a fee simple estate. (*See* Pls. Mot., Ex. F). Instead, the deed refers to the same estate already "surveyed and taken," indicating it attempts to capture the eminent domain proceedings exercised in the location selection. (*See id*.). The Patchin deed grants the premises to the railroad for its "use, benefit, and behoof" rather than explicitly identifying a fee simple estate. (*Id*.). Although unavailable to this Court, both parties rely on *Hill*'s interpretation of the WVR's corporate charter. (Def. Mot. at 17–18; Pls. Mot. at 15, n. 8).

In *Hill*, the Vermont Supreme Court analyzed the eminent domain power afforded to the Western Vermont Railroad, the railroad which surveyed and recorded the location of the parcel it later acquired via the Patchin deed:

> The charter of the Western Vermont Railroad Company provided that their directors might cause such examinations and surveys of the road to be made as they should deem necessary; and that the road, when so surveyed and the survey recorded, should be deemed the line on which the road was to be constructed; and that the corporation might enter upon and take possession of such lands **as were necessary for the construction and maintenance of their railroad, and the requisite accommodations appertaining thereto,** with a provision for the appraisal, by commissioners, of the land so taken, if the parties should disagree as to the price.

*Hill*, 32 Vt. at 70 (emphasis added). The court found the WVR only had the power to exercise its eminent domain power to acquire easements. *Id*. at 74 ("[This charter] was not intended to give [the railroad] power to acquire any more land or any greater estate in such land, for the purposes of a road bed or stations[.]"). Neither the survey and location selection, nor the Patchin deed purport to convey more than an easement in the parcel now owned by Amory Pacific. Further, under *Hill*, the railroad, through its corporate charter, lacked the necessary authority to acquire the parcel from Amory Pacific's predecessors-in-interest in fee simple.

Therefore, the railroad obtained only an easement in the parcel and Amory Pacific, as a successor-in-interest to the Patchin deed, has the necessary ownership interest to maintain its takings claim. As discussed below, the NITU exceeds the scope of that easement, ripening Amory Pacific's claim and entitling it to compensation.

### g.  *Scope of the NITU*

As the Western Vermont Railroad acquired only an easement for railroad purposes, its successors cannot hold more than an easement. The successors, including the most recent railroad—Vermont Railway, Inc.—continuously used the easement for railroad operations. (Pls. Mot., Ex. A). Therefore, the easement remained with the successive railroad operators for these purposes, without reverting to the landowners, until the parcel was converted into a trail. (*See id*.).

When the STB issues the NITU pursuant to the Trails Act, the NITU severed the Vermont Railway's claim to the land because recreational use falls outside the scope of the easement. *Caldwell*, 391 F.3d at 1229; *Preseault II*, 100 F.3d at 1552. The burdens of the easement run with the land. *Coggeshall Development Corp. v. United States*, 23 Cl. Ct. 739 (1991); *Public Utility Dist. No. 1 of Ferry County, Wash. v. United States*, 20 Cl. Ct. 696 (1990). Upon severance, all reversionary rights vested with the successors-in-interest to the original grantors in the Patchin deed. Amory Pacific is one of those successors. (*See* Stipulations, ECF No. 18).

As successors abutting the corridor, Amory Pacific retained the rights to disputed property. Therefore, conversion of the rail corridor to recreational trail exceeded the scope of the easement, constituting a Fifth Amendment taking of Amory Pacific's land. The United States is liable for the taking, and Amory Pacific is entitled to just compensation.

### IV.    Conclusion

Whether relying on the controlling authority of *Preseault II*, or undertaking an analysis of Vermont law, the Court reaches the same result—the railroad obtained only an easement.

Therefore, the Court holds as follows:

1.  Partial summary judgment in favor of the United States is **GRANTED** with respect to

the claims Plaintiffs concede should be dismissed: John and Sylvia Carpenter, [9]
Dwayne Scott Dupee,[10] and SEALL, INC. [11] The clerk is directed to enter judgment
pursuant to RCFC 54(b), there being no just reason for delay.

2.  The United States' Cross-Motion for Partial Summary Judgment with respect to the
    claim brought by Amory Pacific, LLC is **DENIED.**

3.  Partial summary judgment is **GRANTED** in favor of the Plaintiffs with respect to the
    claim brought by Amory Pacific, LLC. [12]

4.  Plaintiffs' motion requesting oral argument (ECF No. 37) is **DENIED AS MOOT**.

The clerk is directed to enter partial judgment accordingly. The parties are ordered to file a joint
status report **on or before April 24, 2020,** advising the Court as to the status of the remaining
claims and proposing a schedule for further proceedings.

   **IT IS SO ORDERED.**

                                                 s/      David A. Tapp
                                                 DAVID A. TAPP, Judge

---

[9] Parcel Nos. 051-015-66938 and 051-015-66925.

[10] Parcel No. 051-015-66944.

[11] Parcel No. 051-015-66933.

[12] Parcel No. 051-015-66122.